HOMER B. RUSSELL and MARION F. RUSSELL, JR., *Appellees,* v. J. D. FERRELL and ANN I. FERRELL, *Appellants,* AMERICAN STATE BANK, a Corporation, *Appellee.*

### No. 40,465

J. D. FERRELL and ANN I. FERRELL, *Appellants,* v. AMERICAN STATE BANK, a Corporation, and HOMER B. RUSSELL and MARION F. RUSSELL, JR., *Appellees.*

(311 P. 2d 347)

Opinion filed May 11, 1957.

*Jerry M. Ward,* of Great Bend, argued the cause, and *S. R. Blackburn, Tudor W. Hampton* and *J. W. Hannah,* of Great Bend, were with him on the briefs for appellants.

*Boyce P. Hardman,* of Great Bend, argued the cause, and *Herbert Diets,* of Great Bend, was with him on the briefs for appellees.

The opinion of the court was delivered by

FATZER, J.: These two appeals, ordered consolidated in this court, arise out of actions in the trial court and its application of equitable principles to a written contract for the sale of real estate, in which both parties sought affirmative relief. Appeal No. 40,465 (cause No. 19,038 in the court below) was an action by the vendors, J. D. Ferrell and Ann I. Ferrell, hereafter referred to as the Ferrells, against the American State Bank, Great Bend, the escrow agent designated in the contract, hereafter referred to as the Bank, for rescission of the contract and for liquidated damages. Appeal No. 40,466 (cause No. 19,047 in the court below) was an action by the purchasers, Homer B. Russell and Marion F. Russell, Jr., hereafter referred to as the Russells, against the Ferrells and the Bank for specific performance of the same contract and to recover the reasonable rental value of the building from January 6, 1956. Upon application, the district court permitted the Russells to intervene and defend in cause No. 19,038.

By agreement of the parties both actions were tried together. The pleadings are of little consequence except as will be hereafter specifically noted. The trial court's extensive findings of fact and conclusions of law best tell the story of the events leading up to the execution of the contract and of the parties' subsequent proceedings thereunder. They are summarized as follows: The Russells are medical doctors and reside in Great Bend, however, during the period of this litigation Homer was in Chicago and Marion was in Kansas City. Each returned to Great Bend for the Christmas holi-

days of 1954 and while there discussed with Don C. Foss, an attorney, their desire to purchase a building in Great Bend to be used as a clinic for the practice of medicine with their father, Marion F. Russell, Sr., a practicing physician in Great Bend. Foss advised the Russells he thought the Ferrell building might be suitable for their purpose and that the Ferrells were interested in selling it. After looking at the building, the Russells told Foss they would purchase it if it could be obtained for a reasonable price and authorized Foss to proceed to negotiate for its purchase and to take all necessary action to acquire it.

Foss and the members of his law firm had acted as attorneys for the Ferrells for several years and were representing them in a number of other matters at the time Foss discussed with the Russells the purchase of the building. Foss continued to represent the Ferrells until January 6, 1956, the date the Ferrells repudiated the contract as hereinafter related. Following Foss' discussion with the Russells, he advised the Ferrells of the Russells' desire to purchase the building and of their intention to use it for medical offices. The Ferrells told Foss they would be willing to sell the building for $42,411.28. Foss advised the Russells the amount of the purchase price and they authorized him to take all necessary action in their behalf to obtain the building. On March 8, 1955, Ferrell went to Foss' office to discuss with him specific terms of the contract. At that time Foss mentioned to Ferrell there was an outstanding mortgage on the building in the principal amount of $20,000 executed by the Ferrells to the Security State Bank of Great Bend, and Ferrell advised Foss he was in a position to pay the mortgage at any time, but in any event it would be paid long before consummation of the sale of the building and possession given to the Russells. During that discussion Ferrell told Foss he would like to remain in the building until November 1, 1955, as a number of his tenants had leases for office space in the building which would not expire until that time. Foss advised Ferrell he could keep possession of the building until January 1, 1956, as the Russells would not have any use for it before that date. Upon the basis of that discussion, Foss, acting as attorney for both parties, prepared the written contract for deed and a warranty deed conveying the real estate in controversy. The Ferrells executed both the contract for deed and the warranty deed and Foss obtained a check from Marion F. Russell, Sr. in the amount of $5,000 as the down payment and showed it to

Ferrell. In addition to acting as the Ferrells' attorney in the preparation of the documents for the sale of the property, he (Foss) acted as their agent in obtaining the $5,000 down payment provided for in the contract for deed. After the contract had been signed by all the parties Foss deposited that instrument, the warranty deed, and the $5,000 down payment with the escrow bank and notified Ferrell of that fact by letter on May 17, 1955.

The contract for deed was entered into March 8, 1955, and is summarized and quoted as follows: It was recited that the Ferrells were the owners of the building and were desirous of selling the property to the Russells and that the Russells were desirous of purchasing it for the sum of $42,411.28, payable $5,000 upon execution of the agreement, the receipt of which was acknowledged by the Ferrells, and "the balance of $37,411.28 to be paid at such time as all of the terms and conditions of this agreement as hereinafter provided have been complied with." The parties agreed that an executed copy of the contract, together with the $5,000 down payment and a warranty deed, conveying the Ferrells' entire interest in the property to the Russells, be placed in escrow in the Bank. It was further agreed that the Ferrells would retain possession of the building until January 1, 1956, and on that date deliver possession to the Russells and furnish abstract of title certified to date covering the premises, and revenue stamps for the warranty deed. Paragraph 4 of the contract reads:

"As of January 1, 1956, and upon being advised by first parties of the payment of the balance of the purchase price as herein set forth, the escrow agent is hereby directed to deliver to second parties the warranty deed hereinbefore mentioned and to deliver to first parties the initial payment herein referred to. In the event that second parties shall fail to fulfill, keep and perform the terms and conditions of this agreement, the $5,000.00 payment herein set forth shall be paid to first parties as unliquidated damages."

The trial court found there was no dispute as to the extent of Foss' authority as agent for the Ferrells relative to the closing of the sale of the building. He had authority to order the abstract of title brought up to date on December 27, 1955, but his authority to act for the Ferrells did not extend to the payment of the mortgage of record, to the eviction of Ferrell's tenants or to giving possession of the building to the Russells. The Russells did not personally negotiate with the Ferrells since complete authority was given Foss and he conducted all negotiations with the Ferrells concerning the sale of the building, and Foss knew the Russells had money available to pay the balance of the purchase price prior to January 1, 1956.

Relying upon the contract, the Russells employed an architect to prepare plans for remodeling the building, and blueprints and specifications were drawn; they also purchased a lot to the south of the building to be used either as a residence for an employee or for parking facilities for their clinic. During the Christmas holidays of 1955 they made preparations for interior decoration of the building, purchased insurance for it effective January 1, 1956, and made arrangements to pay the balance of the purchase price.

On December 19, 20, and 21, 1955, Foss was representing Ferrell at a trial of a court matter in Wichita. While there, Foss and Ferrell discussed the possibility of Ferrell renting space in the building from the Russells after January 1, 1956. Following their return to Great Bend, and on December 29, 1955, the sale of the building was again discussed by Foss and Ferrell when, in a telephone conversation with Ferrell concerning other legal matters, Foss suggested to Ferrell that he come to his (Foss') office to close the sale of the building. Ferrell countered the suggestion by inviting Foss to come over to his office; Foss advised Ferrell he was extremely busy and since all of the papers were in the bank building in which his office was located it would be more convenient if Ferrell would come to his office. No meeting was had and nothing was decided during that telephone conversation with respect to where or when the closing would take place.

January 1, 1956, was Sunday and January 2, 1956, was a legal holiday and all banks in Great Bend were closed on those two days. On January 3, 1956, Foss and Ferrell had a conversation relative to the building at which time Foss told Ferrell arrangements had been made to permit Ferrell to occupy a three-room suite in the northwest corner of the building. Ferrell advised Foss that would be very satisfactory, however, nothing was mentioned as to the date or place of closing the contract or for any urgency for doing so.

On the afternoon of January 6, 1956, without making demand to close the contract and without having tendered possession of the building to the Russells or to their agent Foss, Ferrell went to the Bank and demanded that the warranty deed and the $5,000 check which had been placed in escrow be delivered to him, stating he was declaring a forfeiture under the terms of the contract for the reason that the sale had not been consummated on January 1, 1956. S. R. Blackburn, a member of the Barton County Bar, accompanied Ferrell to the Bank when this demand was made. An officer of the

Bank telephoned Foss and advised him of Ferrell's demand. Immediately Foss telephoned Blackburn who advised him that Ferrell was declaring a forfeiture under the terms of the contract for the reason the sale had not been consummated on January 1, 1956. Foss advised Blackburn that Ferrell had not performed his part of the contract as he had not tendered possession of the building, nor had he released of record the mortgage against the building but that nevertheless Foss, on behalf of the Russells, would make tender of payment immediately. Foss, with M. F. Russell, Sr., met with Ferrell and Blackburn and tendered Ferrell a check signed by M. F. Russell, Sr., in the amount of $37,357.03 payable to J. D. Ferrell and the Security State Bank, Great Bend, which represented the remainder of the purchase price less abstract fees and revenue stamps to be placed on the warranty deed. Ferrell admitted the check was good but stated he did not want it as the Russells had forfeited the contract because payment had not been made on January 1, 1956. Foss then tendered the check to Blackburn who stated he knew the check was good but refused to take it. These events all occurred within approximately two hours after Ferrell repudiated the contract.

On January 12, 1956, the Ferrells filed action No. 19,038 (Appeal No. 40,465) against the Bank to require it to deliver to them the warranty deed and the $5,000 check. Shortly thereafter, the Russells filed action No. 19,047 (Appeal No. 40,466) naming the Ferrells and the Bank as defendants and prayed for specific performance of the contract and for the reasonable rental value of the building from January 6, 1956. At the same time, the Russells intervened in action No. 19,038 which the Ferrells had filed against the Bank.

During the trial, with the approval of the trial court, the parties stipulated among other things that Foss was employed by both the Ferrells and the Russells to prepare the contract for deed; that the purchase price agreed to be paid for the building was fair and reasonable; that the mortgage described in the Russells' amended petition had not been paid and was still of record on May 8, 1956, the date of the trial; that the amount due and owing to the Security State Bank on the note secured by the mortgage was $20,000, plus unpaid interest; that on January 1, 1956, and at the time of the trial, May 8, 1956, the building in question was being occupied by J. D. Ferrell Drilling Co., Inc.; J. D. Ferrell Oil Co., Inc., both

owned by J. D. Ferrell; and, by V. Richard Hoover, all tenants of J. D. Ferrell. It was further stipulated that the Ferrells were the actual title owners of the property and were on or before March 8, 1955, and have been since then in possession of the property; and, that the Russells had not paid the balance due upon the contract to the Ferrells or to the Bank when Ferrell made demand upon the Bank on the afternoon of January 6, 1956.

Following the conclusion of the trial and the filing of the trial court's detailed findings of fact and conclusions of law, motions for a new trial and to set aside findings of fact and conclusions of law were made in each case by the Ferrells, which were overruled, and the trial court entered its decree in action No. 19,038 (Appeal No. 40,465) in favor of the Russells and the Bank, and in action No. 19,047 (Appeal No. 40,466) that the contract be specifically enforced and ordered the Ferrells to deliver possession of the real estate and building to the Russells and authorized the Bank to deliver the warranty deed in its possession to the Russells; that upon delivery of possession of the building and the warranty deed to the Russells, the Bank deliver to the Ferrells the $5,000 check then in its possession and that the Russells pay to the Security State Bank the outstanding principal and interest on the indebtedness secured by the mortgage and pay to the Ferrells as final payment for the building a sum equivalent to $37,411.28, less the amount of the principal and interest paid to the Security State Bank and less the sum of $586.58 per month as the net rental for the building from January 1, 1956, to the date the Ferrells comply with the terms of the decree. From that judgment the Ferrells perfected an appeal in each case.

In considering these appeals it naturally follows that if the Russells were entitled to specific performance, the Ferrells were not entitled to a rescission and forfeiture. Precisely the same equitable principles must govern in a determination of which shall prevail since a decree of specific performance in favor of the Russells is the antithesis of a decree for rescission and forfeiture in favor of the Ferrells.

The Ferrells contend that they performed all obligations imposed upon them by the contract which were not waived by the Russells and that they were entitled to rescind the contract and declare a forfeiture for the reason the Russells failed to tender the balance of the purchase price on January 1, 1956. In making this contention they make the significant admission that,

"Before the vendors may recover they must establish that 'time is of the essence of the contract,' that they have fully performed conditions or that their performance has been waived by the purchasers and that the purchasers have defaulted."

The Ferrells argue that time was the essence of the contract, conceding, however, that it contained no express provisions making time of performance an essential element but maintain that the last sentence of paragraph 4 is a forfeiture clause which is generally held to render "time of the essence of the contract," and rely upon *Drollinger v. Carson*, 97 Kan. 502, 155 Pac. 923; that the Russells had knowledge of the mortgage in favor of the Security State Bank when the contract was entered into, and if it was not paid by January 1, 1956, it was understood that the mortgagee's name was to be included in the final payment; that as evidence of such understanding, the name of the mortgagee was included as a payee when the Russells tendered full payment January 6, 1956; that the Russells waived objection to the mortgage being unpaid on January 1, 1956, and may not now take advantage of such defect as an excuse for nonperformance when they had lead the Ferrells to believe such defect was not objectionable; that the Ferrells' occupancy of the building after January 1, 1956, was acknowledged by the Russells during December, 1955, and approved by them through their agent Foss on January 3, 1956; that the Ferrells were in a position to deliver possession of the building on January 1, 1956, subject to the occupancy by the Ferrells as agreed to by the Russells; and, that failure of the Russells to demand actual possession or their physical entrance into the building constitutes no defense to the Ferrells' action for forfeiture.

Was time of the essence of the contract? We think it was not. The Ferrells did not allege that by reason of the circumstances surrounding the sale of the building time was of the essence and since it was not expressly made so in the contract, their petition for rescission and forfeiture was defective under the facts and circumstances as disclosed by this record. Furthermore, we think the Ferrells misread the last sentence of paragraph 4 of the contract. Decisions of this court cited by them (*Drollinger v. Carson*, supra; *Immell v. Seaverns et al.*, 117 Kan. 12, 230 Pac. 69; *Gregory v. Nelson*, 147 Kan. 682, 78 P. 2d 889) dealing with forfeiture provisions, provide in substance that in the event of failure of one of the parties to perform, the other shall have the option of declaring the contract forfeited, etc. Although paragraph 4 provides that if the Russells shall fail to

fulfill, keep and perform the contract, the down payment shall be paid to the Ferrells as unliquidated damages, time was not made the essence of performance, nor was provision expressly made for declaring a forfeiture. (We treat the provision relating to unliquidated damages as meaning liquidated damages.) Moreover, we do not think the equitable principles the Ferrells contend *Drollinger v. Carson*, supra, enunciates, are supported by that decision. While that opinion contains a statement that forfeiture provisions "are sometimes said to make time of the essence of the contract," a study of it discloses the vendor, who was not in default, made time essential by demanding of the purchaser he perform his part of the agreement within the time specified, and this court held that under the circumstances, the time stipulated by the vendor within which payment was to be made was not unreasonable, particularly in view of the fact that the record did not suggest that if a longer period had been given the purchaser he would have availed himself of it to carry out the contract.

We think the rule here applicable is stated in 49 Am. Jur., Specific Performance, § 42, p. 55, as follows:

"It is a well-established general principle in equity that time is not ordinarily regarded as of the essence of contracts unless it is so stipulated by the express terms thereof or it is necessarily to be so implied from the character of the obligations assumed, and this is especially true as regards executory contracts for the sale of land which are considered in equity as vesting the equitable title in the purchaser subject to the claim of the vendor for the purchase money. Therefore, in the ordinary cases of sales of estates, the general object being to make a sale for an agreed sum, the time of payment is regarded in equity as formal, and as meaning only that the purchase shall be completed within a reasonable time, and substantially according to the contract, regard being had to all the circumstances. . . ."

Decisions of this court to the same effect are *Brown v. Reichling*, 86 Kan. 640, 121 Pac. 1127, and *Guy v. Hansow*, 86 Kan. 933, 122 Pac. 879. In *Brown v. Reichling*, supra, it was said:

". . . We think the conclusion unsound for these reasons: *Ordinarily the time of payment is not regarded as of the essence of such a contract.* (26 A. & E. Encycl. of L. 73; 36 Cyc. 707.) *There was nothing in the terms of the contract here involved, or in the circumstances of the transaction, to take this case out of the general rule.* The plaintiff had a right to require that upon his payment of the $6500 the defendants should deliver him a deed conveying a good and marketable title, as well as an abstract showing the state of the title. *There was no occasion for his making a formal tender of the money until the defendants were prepared to comply with the terms of the agreement on their part.* Under the evidence, the defendants were the actual owners of the property, but the misdescription in one of their deeds made their paper and record

title defective. The changes procured by the draftsman of the deed, without the knowledge of the grantors, did not cure the defect. . . . It was entirely reasonable that the purchaser, knowing of the fact, should ask that if possible the flaw be remedied by a deed from the grantors in the altered conveyance, or in some other suitable manner. 'A reasonable objection to the vendor's title is a good excuse for the vendee's delay.' (36 Cyc. 731.) It seems probable that a quitclaim deed could have been procured. Fair dealing required that the Reichlings should procure such a deed if able to do so. *They apparently made no attempt, basing their action, not on the ground of inability, but upon the contention that the plaintiff had lost the right to enforce the contract.*" (l. c. 643, 644.) (Emphasis supplied.)

There was ample evidence to support the findings of the trial court that the Ferrells had not performed all their obligations under the contract. At the trial the Ferrells stipulated they were still in possession of the building and that there was a mortgage of record against the property on January 6, 1956. The contract specifically provided for conveyance by warranty deed. It was incumbent upon the Ferrells to convey good marketable title, free and clear of all liens and encumbrances. They were not in a position to do so since the mortgage constituted an encumbrance (*Peatling v. Baird,* 168 Kan. 528, 532, 213 P. 2d 1015; *Lohmeyer v. Bower,* 170 Kan. 442, 452, 227 P. 2d 102; 55 Am. Jur., Vendor and Purchaser, §§ 225, 228, 234, 250, pp. 683, 685, 690, 705).

An analysis of the contract discloses that on January 1, 1956, the balance of the purchase price was to be paid simultaneously with delivery of possession of the building and the warranty deed. In such a situation, all are regarded as mutual and concurrent acts, which disable either party from putting an end to the contract without performance or a valid offer to perform on his part, and, with respect to the question of time, after the date provided for the consummation, both parties may be considered equally in default, and neither can hold himself discharged from his obligation of complete performance until he has tendered performance on his side and demanded it on the other (*Eisenhour v. Cities Service Oil Co.,* 149 Kan. 853, 856, 89 P. 2d 912; 55 Am. Jur., Vendor and Purchaser, §§ 104, 537, 581, 632, pp. 580, 930, 975, 1024). Where, as here, time was not made the essence of the contract, and one party seeks to evade his obligation on the ground of delay of the other in tendering performance, he must show either damage resulting to himself or such willful and intentional delay as to evince the intention of the party delaying to treat the contract at an end (*Reid v. Mix,* 63 Kan. 745, 753, 754, 66 Pac. 1021; *Gustason v. DeHaven,* 134 Kan. 324, 327,

328, 5 P. 2d 1095; *Baron v. Lyman,* 136 Kan. 842, 850, 18 P. 2d 137; 55 Am. Jur., Vendor and Purchaser, §§ 582, 617, pp. 976, 1010).

The Ferrells did not allege nor do they contend they suffered any inconvenience or damage by reason of the failure to consummate the sale on January 1, 1956. On the other hand, the evidence clearly established that the Russells were willing and able to pay the balance of the purchase price when due, and their desire to complete the purchase of the building was evidenced by their purchase of real estate adjoining it for use in connection with their medical clinic, their plans to remodel and redecorate its interior, and their purchase of insurance upon the building effective January 1, 1956. The circumstances surrounding the entire transaction do not lend themselves that the exact closing date was of any particular importance to the Ferrells. The Ferrells made no demand for performance upon the Russells nor did they tender performance on their part. Furthermore, the record does not indicate that the Russells waived payment of the mortgage or their right to possession of the building on January 1, 1956.

The Ferrells contend that rescission should be awarded and forfeiture enforced because the payment made in escrow as well as the tender of the balance of the purchase price was by a check signed by M. F. Russell, Sr., and hence did not constitute legal tender. We find little merit in this contention. Tender of payment was refused on the sole ground that the Russells were too late. The question of legal tender was not raised in the pleadings, and was first mentioned during the cross-examination of Foss at the trial. When a party gives a reason for his conduct he cannot after litigation has begun change his ground and put his conduct upon another and different consideration. In short, he may not "mend his hold"; he is estopped from doing so by a settled principle of law (*Redinger v. Jones,* 68 Kan. 627, 75 Pac. 997, *Sandefur v. Hines,* 69 Kan. 168, 76 Pac. 444; *Heidner v. Hewitt Chevrolet Co.,* 166 Kan. 11, 14, 15, 199 P. 2d 481).

The Ferrells next contend the trial court erred in its decree of specific performance in favor of the Russells. They argue the Russells did not tender the balance of the purchase price on January 1, 1956, hence, they were in default and specific performance could not be granted, and cite *Crane v. Coons,* 105 Kan. 214, 182 Pac. 554. The validity of the Ferrells' argument is hinged upon the premise that time was of the essence of the contract. We have previously

held that it was not. We will not review *Crane v. Coons*, supra, at length except to say that was an action brought by the purchaser against the vendor for specific performance of a contract for the sale of real estate and this court sustained a judgment denying specific performance for the reason the purchaser failed to pay the purchase price within a reasonable time after the vendor had obtained title and tendered conveyance of the real estate. There is nothing in this record to suggest that decision is applicable to the facts here presented.

The Ferrells admit the Russells were capable, willing and able to pay the balance of the purchase price when due, and on the basis of all the facts and circumstances of this record we think the trial court had no alternative but to award specific performance to the Russells. As previously indicated, the Ferrells had not placed themselves in a position to perform; they were in possession of the building and their title was encumbered. Under such circumstances, there was no obligation on the part of the Russells to pay the balance of the purchase price on January 1, 1956, to entitle them to a decree of specific performance (*Eisenhour v. Cities Service Oil Co.*, supra; *Brown v. Reichling*, supra; 55 Am. Jur., Vendor and Purchaser, § 581, p. 975).

The Ferrells next contend their demurrer to the Russells' evidence in cause No. 19,047 was erroneously overruled by the trial court. It would serve little purpose to reiterate the evidence or again comment upon the findings of the trial court heretofore summarized. Suffice it to say we have examined the record and are of the opinion the trial court's findings of fact were amply supported by the evidence and that it did not err in overruling the Ferrells' demurrer.

Whether specific performance of a mutual contract shall be decreed, considering all the facts and circumstances which go to make up the equities, rests largely in the sound discretion of the trial court. There was little or no dispute as to the facts. It is the function of that court to weigh the evidence and determine the facts. The trial court did that in its findings of fact, and those findings were in favor of the Russells. There was ample evidence to sustain them. The trial court's conclusions of law were proper under the facts established by the record, and it did not err in rendering judgment in favor of the Russells and against the Ferrells.

The judgment is affirmed.